**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| David W. Eberle,<br>Plaintiff,<br>v.<br>City of Phoenix, *et al.*,<br>Defendants. | No. CV-26-01357-PHX-JJT<br>**ORDER** |

At issue is Defendants City of Phoenix, Mayor Kate Gallego, Vice Mayor Kesha Hodge Washington, Councilmember Ann O'Brien, Councilmember Jim Waring, Councilmember Debra Stark, Councilmember Laura Pastor, Councilmember Betty Guardado, Councilmember Kevin Robinson, Councilmember Ann Hernandez, Phoenix Police Officer Brent Freyberger, Director Joshua Bednarek, Assistant Planning Director Sam McAllen, and Phoenix Police Chief Matt Giordano's (collectively, Defendants) Motion to Dismiss (Doc. 35, MTD), to which Plaintiff responded (Doc. 33, Opp.), and Defendants reply (Doc. 36, Reply). Also at issue is Defendants' Motion to Strike Plaintiff's Notice of Supplemental Facts (Doc. 27, MTS), to which Plaintiff opposed (Doc. 30), and Defendants reply (Doc. 31). After review and for the reasons set forth below, the Court now grants Defendants' Motion to Dismiss and denies the Motion to Strike.

. . .

. . .

. . .

## I. BACKGROUND

Plaintiff's allegations stem from a series of interactions between him and City of Phoenix employees regarding "enforcement actions, municipal decisions, police conduct, and administrative records" in Maricopa County. (Doc. 1, Compl.)

The saga begins in 2018, when Plaintiff, an agricultural producer who operates farmland within the City of Phoenix, purchased property also within the City of Phoenix. (Compl. ¶¶ 24, 31.) Shortly after purchase, he allegedly contacted city personnel to obtain "guidance regarding farm safety considerations . . . in order to ensure safe and responsible agricultural operations." (Compl. ¶ 31.) In response, City of Phoenix officials advised him that agricultural activity was "not a permitted use," "declined to provide [him] guidance," and ignored his explanation that "agricultural operations conducted on farmland are subject to statutory exemptions . . . ." (Compl. ¶ 32.) "In an effort to understand the City's position," Plaintiff allegedly then "identified multiple City-owned parcels classified as residential that were visibly being used for agricultural purposes" and "reported those parcels" to the City. (Compl. ¶ 33.) The City replied that such parcels were zoned differently, and therefore "not in violation of zoning ordinances." (Compl. ¶ 34.) Plaintiff was unsatisfied by the explanation, so he alleges that he "independently verified zoning classifications through publicly available records and consultations with City departments." (Compl. ¶ 35.) The search bore fruit: Plaintiff alleges the aforementioned city-owned parcels carried the same zoning designation as his own land. (Compl. ¶ 35.) Now satisfied that city officials were either confused or, worse, intentionally misrepresenting the situation, "Plaintiff did not pursue formal administrative or legal action," and instead simply proceeded to use the land for agricultural purposes anyway. (Compl. ¶¶ 36–37.)

For six years, the issue lay dormant. Though one can guess what happened next. In February 2024, Plaintiff alleges "a City of Phoenix inspection occurred" at his property, resulting in the issuance of a "Notice of Violation alleging an unpermitted structure at the property." (Compl. ¶¶ 38–39.) Plaintiff disputed the notice, informing the Planning

Director that "the City's enforcement actions lacked legal basis and constituted a public nuisance under Arizona law." (Compl. ¶ 42.) Receiving no reply, Plaintiff believed "the matter had been resolved," though his recent investigation revealed it nonetheless "remained recorded and unresolved." (Compl. ¶¶ 43–45.)

Plaintiff alleges a year later he was "performing a repair to an existing water pipe" on his property when a City of Phoenix Planning Department employee "entered the property without prior notice or consent." (Compl. ¶¶ 46–48.) An exchange occurred between the two, resulting in the employee indicating that "the matter would be referred to a City 'non-compliance' or enforcement unit" and that "Police Department officers [] were present with him or nearby." (Compl. ¶¶ 49–55.) Plaintiff alleges at that point he "began recording the interaction." (Compl. ¶ 56.) The employee allegedly then "cupped his hands to peer inside" Plaintiff's residence. (Compl. ¶ 57.)

After the incident, Plaintiff contacted the City of Phoenix Planning and Development Department Help Desk, seeking more information about the visit, including whether "any complaint, inspection, violation, or Stop Work order associated with the property" had been filed; none had. (Compl. ¶¶ 59–60.) In fact, according to Plaintiff, the staff on the phone "confirmed that the repair activity described by Plaintiff was exempt from permitting" and that they were "surprise[d] that an inspection had occurred in the absence of any complaint or record." (Compl. ¶¶ 60–61.) Plaintiff then filed his own complaints with the Planning Department, the Neighborhood Services Department, and the Phoenix Police Department. (Compl. ¶¶ 62–64.)

Plaintiff then began an investigation into the government's alleged wrongdoing. He contacted the Phoenix Neighborhood Services Department, and was allegedly told that the day after the incident an "anonymous complaint" had been filed. (Compl. ¶ 65.) The Neighborhood Services Department also "expressed surprise that the inspection had been assigned to a senior supervisory official and indicated that such a level of inspection was unusual in the absence of any prior complaint or recorded enforcement activity," noting that no further enforcement actions or notices had been lodged. (Compl. ¶ 66.) The Phoenix

Police Department's Non-Emergency Help Line told him that "no calls for service, officer responses, or police activity" were indicated at his property at the time of the dispute. (Compl. ¶ 63.) The Phoenix Police Department's Professional Standards Bureau (PSB) confirmed the position upon review of additional internal records. (Compl. ¶ 68.)

A few weeks later, in March 2025, Plaintiff "discovered a second Stop Work notice posted at the property" regarding the "installation of a new underground DWV system and new copper plumbing" despite him failing to "recall performing work requiring City permits on that date . . . ." (Compl. ¶¶ 71–74.) Plaintiff alleges he was "not contacted prior to the posting" of the second Stop Work notice and not provided an "opportunity to clarify the nature of the work . . . ." (Compl. ¶ 76.)

Plaintiff allegedly then filed a complaint with the Phoenix Office of Accountability and Transparency (OAT). (Compl. ¶ 77.) OAT informed him that it lacked authority to investigate police misconduct. (Compl. ¶¶ 78.) A few days later Plaintiff alleges he received notice from the PSB that "police officers had in fact been present in the area responding to an alleged alarm call" on the day of the incident. (Compl. ¶ 80.) Plaintiff alleges he requested supporting documentation about the alarm call, but as of the date of the complaint, had received no document production. (Compl. ¶¶ 82–84.)

In April 2025, Plaintiff then received a "formal Notice of Ordinance Violation" signed by the Planning and Development Deputy Director, referencing the March incident and another inspection, one previously unknown to Plaintiff. (Compl. ¶¶ 85–89.) The Notice allegedly imposed a corrective date of May 15, 2025, and mandated that any appeals be submitted with a "non-refundable administrative processing fee," without indicating "any waiver or alternative appeal mechanism." (Compl. ¶¶ 90–91.) The notice "impaired Plaintiff's ability to conduct business, including pursuing contractual opportunities, and caused reputational and operational harm . . . ." (Compl. ¶ 92.) Plaintiff alleges he requested review of his case by a slew of Phoenix officials, including the "Planning Director and former Interim Police Chief," as well as "the Mayor and all City Council Members."

(Compl. ¶¶ 93–95.) The officials took "no corrective action" despite "actual notice and authority to intervene." (Compl. ¶ 96.)

Finally, Plaintiff alleges that in December 2025, the City of Phoenix Water Services Department performed a "water meter replacement" at Plaintiff's property, in which the City "restored potable water service without performing required disinfection procedures following a system disturbance" in violation of "accepted drinking water safety standards and industry best practices." (Compl. ¶¶ 97–99.) Plaintiff allegedly again notified several officials about the violation, and each failed to act. (Compl. ¶¶ 101–03.)

Flowing from these allegations, Plaintiff names as Defendants, the City of Phoenix, Mayor Kate Gallego, Vice Mayor and Councilmember Ann O'Brien, Councilmember Jim Waring, Councilmember Debra Stark, Councilmember Laura Pastor, Councilmember Betty Guardado, Councilmember Kevin Robinson, Councilmember Anna Hernandez, Councilmember Kesha Hodge Washington, Phoenix Professional Standards Bureau Police Officer Freyberg, Phoenix Police Chief Matt Giardano, Phoenix Planning Director Joshua Bednarek, Assistant Planning Director Sam McAllen, and Jane and John Doe City employees and officers.

Plaintiff pleads seven causes of action, five counts of civil rights violations under 42 U.S.C. § 1983, including a deprivation of procedural due process, retaliation for protected activity, unreasonable search, excessive fines and unlawful fees, and *Monell* municipal liability (Compl. ¶¶ 125–55), one count of state-law interference with lawful agricultural activity / public nuisance (Compl. ¶¶ 156–59), and one count of declaratory and injunctive relief (Compl. ¶¶ 160–63). Upon these causes, Plaintiff prays for declaratory, injunctive, and equitable relief, a protective order, and compensatory damages. (Compl. ¶¶ 164–98.)

## II. LEGAL STANDARD

Rule 8 requires every pleading that states a claim for relief to contain three things: "a short and plain statement of the grounds for the court's jurisdiction," "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for the

relief sought." Fed. R. Civ. P. 8(a)(1)–(3). Shotgun pleading violates these rules by preventing "the opposing party from reasonably being able to prepare a response or simply making the burden of doing so more difficult." *Gibson v. City of Portland*, 165 F.4th 1265, 1288 (9th Cir. 2026) (cleaned up) (citing 5A Wright & Miller's Federal Practice and Procedure § 1326 (4th ed. 2024)). Shotgun pleadings also "waste scarce judicial resources, inexorably broaden the scope of discovery, wreak havoc on appellate court dockets, and undermine the public's respect for the courts." *Id*. (cleaned up). There are four central forms of shotgun pleading:

> (1) a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to be a combination of the entire complaint; (2) a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) a complaint that fails to separate into a different count each cause of action or claim for relief; and (4) a complaint that asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Id*. (citing 35A C.J.S. *Fed. Civ. Proc.* § 310 (2025)). The appearance of any one of the four forms is independently sufficient to reject a pleading, given the Ninth Circuit's recent articulation that "district courts do not have to accept such shotgun pleadings." *Id*. at 1290.

If Rule 8 is designed to promote brevity and clarity, then Federal Rule of Civil Procedure 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) the absence of sufficient factual allegations to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When analyzing a complaint for failure to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up). Legal conclusions couched as factual allegations are not entitled to the assumption of truth and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *Iqbal*, 556 U.S. at 679–80. However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## III. ANALYSIS

Plaintiff's Complaint is a textbook case of shotgun pleading. Each succeeding count "adopts the allegations of all preceding counts, causing each successive count to be a combination of the entire complaint." *Gibson*, 165 F.4th at 1288; Compl. ¶¶ 125, 134, 140, 145, 151, 156, 160 ("Plaintiff realleges and incorporates by reference all preceding paragraphs"). Worse, the counts mostly refer to the collective "Defendants" as having undertaken a proscribed action. (Compl. ¶¶ 127–28, 131–33, 136, 138–39, 141–44, 146–47, 149–50, 158–59, 161–62.) Even those counts listing a specific Defendant oscillate between implying an individual's liability and the City's broader municipal liability. For example, Count III's unreasonable search allegation says "Defendants, acting under color of state law, entered private property and peered into the interior . . . . exceed[ing] any permissible scope of administrative inspection and constitute[ing] an unreasonable search." (Compl. ¶¶ 140–42.) The next paragraph then seems to specify that "Defendant City of Phoenix is liable," except then the Complaint flips again, saying that "Defendants' conduct violated" the Fourth Amendment. (Compl. ¶¶ 143–44.) Which is it? Does the City have municipal liability? Or did the individual defendant—whoever that may be—act beyond the scope of their authority? If both are liable, the Complaint must state so, and why. As it

currently reads, Defendants are required to pencil in so many details that they ought draft the Complaint.

The Court also recognizes in this Complaint a familiar practice impacting courts in the district. That is, the use of Artificial Intelligence (AI) in pleadings. *See, e.g., Shelly George, Plaintiff, v. Brooke L Rollins, Defendant.,* 2026 WL 3015346, at *1 (D. Ariz. Oct. 7, 2026) (noting the Complaint "appears to have been generated by [AI] as it resembles other AI-generated complaints the court has encountered"). The Court takes this opportunity to expound on its usage.

AI is an assistive technology. It helps both attorney and *pro se* litigant alike to research, home in on crucial questions, digest complex statutes, draft with precision, file fewer errors, and more. It is also an obstructive technology. It is sycophantic, lacks judgment, and its persistence (per its reinforcement training) is counterproductive, in that good litigants know when to hold 'em and when to fold 'em. AI does not, instead adopting the kitchen-sink approach: throw everything at the Court in the hopes something sticks. In so doing, legitimate claims end up buried in a morass of words, words which alone make sense, but together form word salad. Put differently, the result "appears facially sufficient provided one does not read very carefully." *Hernandez v. San Bernardino Cnty.*, 2023 WL 3432206, at *6 (C.D. Cal. Jan. 26, 2023). Further, it is this court's experience that for every good AI-assisted filing there are ten more obstructive ones. And the obstructive ones are often like the head of Hydra, for each one dismissed, several more follow.

The problem is particularly acute in the context of *pro se* litigants who, unlike a licensed attorney, may struggle to differentiate between a substantive argument and a vacuous one. Indeed, in the Court's experience with *pro se* AI-filings, after unscrambling the egg, little remains. The Court does not opine on whether the problem is by technical design or by user error. But fault is beyond the point. The Court simply decries the overwhelming volume of filings, and sheer verbiage therein, which to date have pummeled courts. And to be clear, it is not just the volume of filings beleaguering the Court—good filings often obviate the need for more filings—it is the quality and size of those filings.

Unlike an attorney who risks sanctions and their license with each filing, *pro se* litigants risk little. They are essentially unencumbered by the deterrent effect flowing from repeated appearance. *See, e.g., Gouveia v. Meridian Fin. Invs., LLC*, 432 So. 3d 49, 51 (Fla. Dist. Ct. App. 2026) (Lott, J., concurring) (noting *pro se* litigants "are usually not repeat players in the court system" meaning sanctions "do nothing to prevent the problem of the continued use of AI by new *pro se* litigants") *reh'g denied* (Apr. 20, 2026).[1] Alas, what is this Court to do? Though "Judges are not like pigs, hunting for truffles buried in briefs," like Circe to Odysseus's men, AI would have it otherwise. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

As a result of the foregoing, Defendant's Motion to Dismiss is granted. The Court will permit Plaintiff leave to amend on all counts with restrictions. Plaintiff's First Amended Complaint (FAC) must be ***no longer than 25 pages*** and it must refrain from shotgun pleading. It should be ***very specific*** about which claims go to which Defendants. Although sister courts have begun placing restrictions on the use of AI, this Court does not. *See, e.g., Shelly George*, 2026 WL 3015346, at *1 (prohibiting plaintiff rom "using AI to draft her amended complaint").

Plaintiff is nonetheless encouraged to review any AI-assisted pleading carefully. Ask, for each cause of action, who, what, where, when, why, how—and, in some cases, *which*? For instance, per Count II's retaliation claim, Plaintiff alleges "Defendants escalated enforcement actions, including issuing additional Stop Work orders and Notices of Violation, recording violations against Plaintiff's properties, refusing to correct or withdraw unsupported enforcement records and known errors." (Compl. ¶ 136.) *Who* are Defendants? To "retaliate" against Plaintiff, Defendant would need to have known Plaintiff submitted complaints and "petition[s]," forming the basis of his protected activity—*how* did they know? To *which* Stop Work order or Notice of Violation does Plaintiff refer? And

---

[1] This discussion sets aside the issue of AI engaging in the unauthorized practice of law. Given that *pro se* litigants now constitute an estimated 22% of cases in federal court, many of whom rely on AI, the technology has likely now made hundreds of thousands of shadow appearances on the federal docket. Or Cohen-Sasson, *Artificial Access to Justice: AI and the Surge in Pro Se Litigation*, Harvard L. & Pol'y R., Vol. 21.2 (forthcoming 2027).

given Plaintiff's mention of the plural, "properties," is there more than one at issue? Whatever the answers may be, they should be included in the FAC.

**IT IS THEREFORE ORDERED** granting Defendants' Motion to Dismiss. (Doc. 35.) Plaintiff may file a First Amended Complaint **no later than thirty (30) days** following this Order. Plaintiff's pleading is restricted to **twenty-five (25) pages**. If Plaintiff fails to adhere to either condition, the Clerk of Court is directed to close this matter.

**IT IS FURTHER ORDERED** denying Defendants' Motion to Strike (Doc. 27) as moot given Plaintiff has been granted leave to amend with restrictions. He may allege the supplemental facts in the FAC, so long as it complies with the Federal Rules of Civil Procedure and this Order.

Dated this 22nd day of October, 2026.

Honorable John J. Tuchi
United States District Judge